The Illinois Rappellate Corps, 6th Division, is now in session. The Honorable Justice Mary L. Bigbrook is presiding. Good afternoon. Please sit down. Would you call the case? Case number 1-22-1666, Nathan Gibbons v. GlaxoSmithKline, LLC, et al. Thank you. As you both all, more than both, all probably know, we allot 20 minutes aside. We're relatively generous. If necessary, to take a little more time, we will let you, especially if we have a lot of questions, which we may. Before we begin timing you, however, I would like the lawyers who are actually going to argue on both sides, beginning with the appellant, to please give us and spell your name. And for the appellant, let us know if you'd like to reserve any time for rebuttal. Good afternoon, Your Honors. My name is Jack Berry. I'm a law firm. I'm a parent and father of a kid from Chicago. My first name is J-A-C-K. My last name is B-I-E-R-I-G. And I'll do 35 minutes. Thank you. Thank you, Mr. Berry. Good afternoon, Your Honors. My name is Harrison James. I'm here on behalf of the appellant. That's H-A-R-R-I-S-O-N-J-A-M-E-S. Okay. Mr. Berry, whenever you're ready, you may begin. I should tell you, and this won't come out of your time, that microphone, which you should use because it's for recording, does not amplify. So please keep your voice nice and loud because there are people all the way in the back of the room and they do want to hear you. Thank you, Your Honor. The Journal of the American Medical Association was scheduled to publish an article which posited a link between raminidine, which is an ingredient in the drug Zantac, and cancer. Prior to publication, JAMA made a limited release of embargoed copies of the article to various reviewers. Shortly before the publication date, JAMA received a communication from a reviewer pointing out significant flaws in the methodology on which the article's conclusions were based. The JAMA editors carefully considered the points made in that communication and concluded that the methodology used to analyze the epidemiological data in the article was, in fact, fundamentally flawed. Accordingly, they pulled the article. At the same time, they asked the authors to conduct a further analysis of the methodology, which the authors did. JAMA published the revised article a year later, and the authors published the other parts of the article, albeit not in a journal. The original article's positing of a link between Zantac and cancer was very welcome news to Gibbons and the other plaintiffs in the product liability lawsuit that they had brought against manufacturers of Zantac in California. Gibbons and his legal team suspected that the manufacturers of Zantac had pressured JAMA into pulling the article, so they promptly demanded a number of things from JAMA relating to the withdrawal of the article. Among them were, one, the communication that had raised the questions about the methodology, two, all documents showing the deliberations of the JAMA editors, and three, all correspondence between the JAMA editors and the reviewers. JAMA, in response to this request, did provide the original manuscript, the information on which the manuscript had been based, numerous other documents relating to the article, and the explanation by the authors of why there was a need for further analysis of the epidemiological data. Did you say explanation of the authors? Yeah, the authors actually issued a press statement as to why the article was pulled and what further work had to be done. But that's part of the problem here is that they don't believe that they've received any information pretty much from the authors or anyone as to why the... Who didn't receive? That's part of the problem. You're saying that the authors provided information as to why the article was not published. The authors made a public statement as to the methodological flaws which caused JAMA to pull the article. In any event, JAMA gave a lot of information, but it refused to produce any of the peer-reviewed materials. It invoked both the common law peer-review confidentiality doctrine and the Illinois Reporters' Privilege Act. JAMA explained at the time that production of the materials that it was withholding would undermine the assurance of confidentiality that is given to peer reviewers and that is essential to effective peer review in the interest of advancing science in general and medicine in particular. It noted a fact that should be clear that absent strict guarantees of confidentiality, peer reviewers are not going to make critical comments about a manuscript or an article and might well decline to participate in the process at all. Well, okay. How are you defining and where is its definition based on peer review? I mean, as we all understand peer review, it doesn't include some outside person who happens to get an early draft saying, huh, we don't need to say anything. How are you defining peer review and where does that definition come from? Okay. Well, first of all, I would urge the Court to read the declaration of Annette Flanagan that's included in the record where she goes through, she has a lengthy declaration as to peer review, but let me read you one portion of it. She says, and she's very knowledgeable, she's an editor of JAMA and has had a lot of experience with this, and I really urge you to read her declaration. But I guess I have read her. That's what she says. But in terms of legal, the legal definition of peer review. The legal definition of peer review is any comment that bears on the validity of the article that is needed by the publisher, in this case JAMA, to determine whether the article is scientifically or medically correct or not. Okay. And what case law or legal authority do you rely on for that definition? Well, I think you can, first of all, read this Court's opinion in the Souquier case. You can read a number of the cases involving the common law privilege. The In re Bextra case from this Court, and there's a very similar case from the Northern District of Illinois, and there's other definitions in the case in Massachusetts that are cited in the brief. I think you'll see definitions of peer review in all of those. And your definition is any comment that bears on the validity of any one? Well, if someone says, you know, if some member of the public says, you know, the article is crazy, I wouldn't call that peer review. But if there is a thoughtful comment about an article, either that is being considered for publication, that has been announced for publication but not published, or even after publication, where a thoughtful comment is made that there is something wrong with the article or there's other issues that should be considered by the publisher, I would consider that peer review. And that would include government employee A? That would include government employee A. It would include any scientist or doctor who read the article. And let me just read you from what Ms. Flanagan says. She said, the need for peer review and editorial evaluation does not necessarily end when a manuscript is accepted, scheduled for publication, or published. Journals are responsible for the scientific integrity of material they publish long after an article is published and circulated. And thus, editors may engage in peer review and editorial evaluation years after publication of an article if, for example, a question about the validity or accuracy of a study arises. So I'm saying, in response to your question, that peer review would include the thoughtful consideration of any substantive comment about the validity of either the conclusions or the methodology of an article that is being considered. So would that definition include only those who are qualified to provide the comment? In other words, presumably, the folks that JAMA had engaged to peer review Dr. Braunstein's article are in the same or similar fields. Presumably correct, but they may not know everything. This is a developing area, and someone who was extremely knowledgeable about the issue didn't say, you know, the article is wrong. The comment explained exactly what the flaws were and why the person who provided the integration thought they were flawed. But, you know, government official A could be a bureaucrat who has no scientific training. We know nothing about government official A. I understand that you want to protect the source and the identity of the source, but you haven't given us anything, at least you haven't given the other side. We haven't given the other side. About that person's qualifications, I mean, what I'm struggling with is where do you draw a line between, just as my colleague said, some outside interested person and a peer reviewer? I don't think we draw the line between an outside interested person and a peer reviewer. What we do is we look at the substance of the comment. We look at whether it has some merit. This was not some secretary at a government agency. This was a person who was able to give very thoughtful comments about what the person perceived as a serious methodological flaw in the analysis of the epidemiological data that was used in the article. And we have an obligation, and JAMA has an obligation, to publish things to the best of its knowledge that are correct, that are scientific. And the privilege applies even if JAMA did not engage this person in the first instance to peer review the article. That is correct. And then the second question I have, your opponent hasn't raised this, but I think it's an important question because everyone seems to assume that Illinois courts have recognized a common law peer review privilege, and I don't know that anybody has identified any Illinois reviewing court to recognize such a privilege. And the reason why I think it's important is our Supreme Court has said to us that matters of extensions of privilege or recognizing new privileges are best left to the legislature. Well, first of all, the Federal District Court for the Northern District of Illinois, which I realize is not a state court, didn't recognize the common law privilege. And this very court, in a case, by the way, that I argued 30 years ago or 31 years ago. Nice to come full circle, right? It is. That's why I'm probably the only person who knows that the pronunciation of C-U-K-I-E-R is Sukiye. This court stressed the importance of protecting peer review, of protecting thoughtful analysis. Was the Sukiye case in the context of the Medical Studies Act? It was in the context of the reporter's privilege. Reporter's privilege, okay. But if you read that case, you'll see that a lot of the thoughtfulness or the reasoning behind the case was based on the importance of protecting the confidentiality of the peer review process and editorial decision-making that is engaged in by a responsible medical journal. I'm not disputing the important policy interest at stake here. My question really is, is it the courts? Is it the court or is it the legislature which should recognize that policy interest? I think, well, the common law, which is what we're dealing with, is never a legislative thing. And I think it's, you know, I don't think there's a statute on, you know, the doctor-patient protection or the water plant. These are all common law privileges that have been articulated by the courts. And so I think the legislature could certainly have enacted something. But here's an interesting comment. If the legislature thought that what was done by the federal court in Illinois in recognizing a common law privilege was wrong, they could have initiated legislation to undo that. So apparently, you know, the legislature had no problem with the recognition by a court in Illinois of the common law peer-review protection statute. So in any event, so getting to that, as I said, this court itself has recognized the great importance of protecting the confidentiality of the peer-review process in the Souquier case. Okay? And basically what the common law privilege holds is that peer-review materials, and I want to emphasize this is very much peer-review materials, are not discoverable after a showing of a need for those materials that is so substantial as to outweigh the strong interest in the confidentiality of peer-review materials. Okay? So that's what, as a hearer, I think it's very important to note that Gibbons has not shown and cannot show any substantial need for the peer-review materials. Okay? Originally, he asserted that he needed the materials to show that defendants in the product liability case had pressured JAMA to withdraw the article. But, at that point when he said that, he hadn't taken any discovery of the defendants in that case. Later, he took discovery and he found out that there was absolutely no communications between the defendant drug companies and JAMA. So, at that point, he changed his tune. He said that he needed the materials to show misfeasance by the FDA. Well, that's hardly a substantial need for purposes of his product liability case, which is basically trying to show that the manufacturers were putting out Zantac with knowledge that it caused cancer. It has nothing to do with misfeasance by a government agency. In fact, it's quite an ironic statement, given that it was the FDA that ordered removal of Zantac with ranitidine from the market. So, that argument totally fails. So, instead, Gibbons resorts to two arguments, one of which we've already discussed, which is, he says, this is not really part of peer review at all. And I think I've tried to answer the court's question about whether, sort of after an article is scheduled for publication, it's still in peer review. And, as I said, it's very much a fundamental part of peer review if we want medical journals to publish accurate information. Counsel, you're almost out of time, and I do want you to address the reporter privilege and the vestiture. Okay. I think we all want you to address that. Thank you. Okay, so, there's no question that the editors of JAMA are reporters for purposes of the Reporter Privilege Act. That's what this court has held, and that the person who gave the information is a source under the Act. Okay. The law is clear that a reporter may be divested of the privilege only if the party seeking disclosure satisfies its burden on several shows. But three are particularly relevant. One is that the information in question is relevant to the proceeding. Two is that all other sources of information have been exhausted. And three, that a specific public interest makes the disclosure essential. Givens can't make any of those show. First of all, he says that the relevance is that he wants to expose an effort by government officials to, quote, suppress science. Well, first of all, JAMA didn't suppress anything. The authors were free to publish whatever they wanted and wherever they wanted, and, in fact, they did. But more importantly, the position that the FDA sought to suppress science is totally irrelevant to the underlying product liability claim, which deals with whether ranidity causes cancer. Okay? And Givens' self-appointed role as the overseer of the FDA does not make his demand for peer review and for this material relevant to his product liability case. Turning to the second point, he made no effort, Givens made absolutely no effort, to find other sources of this material. So how should they have exhausted all sources of information? Okay, two ways. First of all, they should have. Since their original theory was that the defendants had pressured JAMA to pull the article, they could have engaged in discovery in the product liability case saying, what communications did you have with JAMA about the issues in the case? They subsequently did that after they brought this case, and they found out that there were no communications. Second, they had long suspected that it was probably an FDA official who wrote. So, as you probably know, under the Federal Freedom of Information Act, they could have issued a Freedom of Information Act request to the FDA saying... Or maybe to every government agency. Well, they could have done it to every government agency, but they themselves acknowledge that both the authors and they, quote, strongly suspect that it was the FDA. We're not saying they should have gone to every agency, but if they strongly suspect that it was the FDA, they certainly could have issued a Freedom of Information Act request to the FDA, which they did on another point. Could you have asserted a privilege at that point? The FDA? No. If they found out from the FDA what happened, we would have done our best to safeguard the privilege. And they would say, well, you know, it might take a long time, and we don't know what. If they had said, we want to know if you've had any communications about an article about Zantac that was scheduled to be published in JAMA on January 10, 2020, by the author so-and-so, it would not have taken very long for the FDA to tell them. And it's very important for us to be able to guarantee to peer reviewers that we will honor confidentiality. If the FDA, if in fact it was the FDA, said, yeah, we didn't submit that, we would still have honored our commitment to peer review. And as to the notion that they have exhausted all other forms of trying to find out this information is, frankly, ridiculous. And the courts in Illinois have ruled that the fact that it's more convenient to just get it from a reporter is absolutely no basis for undoing a privilege. And as for the third prong about the material having to be essential to protect a public interest, let's face it. The real interest that Gibbons seeks to advance in this case is his interest in winning this product liability case. That is a private interest, not a public interest at all. There is a public interest in the promotion of public health and safety and in the free flow of scientific information. Those are public interests. But they would be directly underlined by the vestiture of JAMA's statutory privilege. The promotion of public health and the free flow of scientific information depend on keeping the sources of confidential editorial and peer review information confidential. Otherwise, as I said before, many of those who might offer candid comments on medical or other scientific articles would refrain from doing so or would pull their punches lest they be subject to retribution from the author of the articles on which they are providing input or from others. As the court, by the way, this court recognized that in Souquier. So once again, Gibbons basically says, well, you just have to defer to Judge Johnson. But as the Supreme Court held, our Supreme Court held in Northcock v. Fylde, whether disclosure of information is prohibited by a statutory discovery privilege and whether any exception to the privilege applies are matters of law subject to de novo review. And in any event, even if you were to look at what Judge Johnson did, it's contrary to the manifest way of the evidence for the reasons I've stated. I want to make one last point. Give me two more minutes and I'll be done. I will. Thank you. Thank you. I appreciate that. We would respectfully submit that Gibbons was also wrong to demand a privilege law that would identify all the documents withheld as privilege. We have no problem with giving to Your Honors or to Judge Johnson in the lower court the information that you sought. But production of such a law that identifies the source of the information to Gibbons would basically give them the very information they were trying to protect. But your law didn't identify the source of the information. That's where we wound up giving to Judge Johnson, but they wanted to have a law that identified the source of the information. And we said we can't do that. That would completely undermine the peer review protections that the statute and the common law protect. So, Your Honors, I'll just in conclusion say. If you're done, I have a question. I have a rousing conclusion. I didn't ask the question. I didn't ask the question. Sorry. So, Mr. Barrett, on the question of whether this information is relevant, your opponent says in his brief, and I'd like you to respond, that it's relevant because the drug company defendants in the underlying litigation intend to rely on the Gao study, which was a study by, if I understand it correctly, a scientist employed by the FDA. And in that study, Dr. Gao is critical of Dr. Braunstein's study that drew a link between Zantac and cancer. And so they say that it's important to understand what caused JAMA to withhold publication of that original study. When they're going to be relying, defendants are going to be relying on the study that JAMA published sometime later, that did not draw that link. Well, first of all, the authors themselves, as I responded to a question from Justice Schmick, the authors themselves explained what the problem was, which was that serious issues had been raised about the methodology used to analyze the epidemiological data. Okay? But the question in the underlying product liability case is whether this Zantac, which at the time contained ranidity, whether that caused cancer, and whether the pharmaceutical companies knew it at the time. What the article, the original article, by the way, which they have, we gave them the original article, what the article said in 2020 is not relevant to what these drug companies knew for the 20 years that they were marketing Zantac with rinitidine. And they are perfectly able to hire their own experts to explain why they think that the JAMA article as published was wrong or what have you. But what they're claiming is, they're saying we're protecting the free flow of scientific information and against censorship. We're not censoring anyone, and we're not preventing the free flow of scientific information. We published a revised article. They publicized their own findings. I just don't see how that is essential to their case. That's my answer to your question. Now for my rousing conclusion. No, no. Just so we're clear too, Mr. Berg, your position is that the standard of review doesn't matter here, because either way we should reverse the trial court. Is that correct? I didn't hear you. Your position is that the standard of review does not matter here, either way we should reverse the trial court. Well, it matters. I mean, it matters. But applying either one of them, you should reverse. First of all, these are questions of law, for the reason we stay in the brief. But if you think that you need to give deference to the trial judge, I would say with respect to the common law privilege, she didn't give any reasoning whatsoever. She just said, I'm finding that the privilege doesn't apply, so there's no deference there. I have to push back a little bit, because you understand that she couldn't go chapter and verse on what's in these documents, right? Because that would then expose the very thing that you're seeking to protect. So she was somewhat limited in explaining why, after her in-camera review, why she determined that the documents were not privileged. I don't think she was that limited. She would not have had to identify the source of the information, and she could have said, questions have been raised about this or that. I don't think she was that. She made no effort whatsoever. She just had no explanation. So I just don't see how you can defer to that. And with respect to the Reporters' Privilege Act, it's true that she had an analysis, but she concludes, for example, well, they did exhaust all other sources of getting information. Yeah, but she doesn't even mention the fact that they hadn't even sought discovery in the California case, that they hadn't done a Freedom of Information Act request, or she mentions it. But then she concludes, well, they've exhausted it within the meaning of the statute. If you look at these other cases, they make it very clear that you really have to work hard to exhaust these other sources of information. And with respect to relevance, as I said, it's very hard to understand what the relevance is of a critique by some official of an agency, which they recognize is very likely to be the FDA, what the relevance is to the basic question in the underlying case, which is, you know, did raminity cause cancer, and did the manufacturers know that for a long time? Anyway, the basic question before this Court is whether JAMA will be divested of the confidentiality of its peer review and editorial decision-making processes, confidentiality to which it's entitled under both the common law and the Illinois Reporters' Privilege Act, simply because Givens is unhappy with JAMA's decision not to publish an article that he deemed helpful to his product liability case in California. He can hire whatever experts he wants to make the arguments he wants. He actually knows and can use the article as it was originally supposed to be published, and it was later published. But the mere fact that he doesn't like the fact that the article was pulled is not a nearly sufficient reason to basically undo the confidentiality that is essential to sound medical and scientific journalism. So for the reasons set forth in JAMA's briefs and in the argument this afternoon, the answer to the question is resoundingly no. Were it anything else, if this Court were to divest the AMA of the reporters' privilege or to undo the common law privilege, our society's interest in high-quality medical and scientific journalism would be severely undercut. And the ultimate losers of this case would not be JAMA or not be JAMA alone. It would be the patients who benefit from advances in medicine that result in part from the publications in JAMA and other high-quality medical journals. Thank you. Thank you. I hope that was well said. We'll still give you five minutes. Thank you, Judge. Mr. James, if you don't mind, why don't you start with the standard of review here? Because Mr. Burge is arguing that the standard of review is de novo for a couple of reasons. One is that the trial court didn't have an evidentiary hearing, and that the trial court made no findings of facts. So it sounds like he may be correct about that. But you, in your brief, argued that the standard of review is manifested in the evidence. Sure. Good afternoon, Your Honors. I'll briefly address the standard of review, and then I'll kind of go into my little intro. Regarding the standard of review, we were of the opinion that, expressly with the reporter's privilege, that it would be manifest weight of the evidence, given what was said in the Palachuk case, which expressly that was a reporter's privilege case, and they said that for construing divestiture under the reporter's privilege, it's a manifest weight of the evidence standard. So that is what we went with, given the Supreme Court's decision in Palachuk. Regarding the common law peer review process privilege, it was our understanding that there was a dispute with respect to whether or not what is a peer reviewer. I see how you could think that's more of a legal question, but I think we're of the mindset that, again, regardless if you're applying de novo review, if you're applying some mixed question of a clearly erroneous standard, or if you're applying manifest weight of the evidence, that the appeal should be denied in full. And so just to start things off, again, I'm appearing for the appellee Nathan Gibbons, who is standing in for the thousands of cancer victims in the California-coordinated proceedings on Zantac. And just to put it simply from our perspective, this case is about protecting peer review. It is about protecting privilege. You've heard counsel for JAMA argue about length about very real, very important policy considerations that undergird a medical journal's ability to assert a privilege protecting peer review communications. The issue here, however, as some of your questions were getting at, I believe, is that JAMA is attempting to extend peer review and to extend these privileges to cover a factual scenario that they were never meant to cover. To be clear, a government agency intervening, using taxpayer dollars no less, to pressure an independent medical journal to pull an article linking a popular medication to cancer on the very eve of its publication, that is not peer review. That is something altogether different. That's an agency overstepping its regulatory authority, putting its thumb on the scale. Even if all that's true, what does that have to do with your case? What does that have to do with our case? That has to do a lot with our case. So speaking to the relevance question that was discussed earlier, again, as was mentioned, the FDA is front and center in this litigation. If this is, in fact, the FDA intervening here, and again, we don't know that it is the FDA, but if it is, or if it's some other government agency, given that the drug company defendants are repeatedly touting the color of the FDA's office and banding about these studies, like the gout study that Your Honor expressly referenced, and the Florian study, which was another study that was published in JAMA, and then if that agency that put out these critical pieces was also pressuring an independent journal to pull a study that was exposing a cancer link in this drug, that is evidence that a jury should consider about general causation. An element of every plaintiff's cause of action in this JCCP for their negligence and strict liability claims is causation. And how to show general causation in these cases, namely that the drug in question is capable of causing a type of cancer, is to look at the scientific literature. And if the FDA is intervening and pressuring a medical journal to pull an article showing a cancer link, and it is going out and publishing studies that are attacking that very author's work, that is something a jury should consider in weighing the bias and the credibility of the FDA and in evaluating the overall literature that goes directly to general causation, which is the central issue in this litigation. But Mr. Berg is arguing that instead of encroaching upon the privilege, that you could have simply submitted a freedom of information request to the FDA. Right. So the second divestiture element that was to discuss is exhaustion, right? And so they're saying, okay, go and FOIA the FDA. Well, again, we do not know that it's the FDA, even if we did know it was the FDA, even if we knew if it was a specific department within the FDA, say CDER, the Center for Drug Evaluation and Research, that department is massive. It has, you know, hundreds if not thousands of employees. If we were just to issue a blanket FOIA, even knowing kind of the specific date range that we know from the privilege law now, they would still come back to us and, for instance, in this litigation, we did issue a FOIA request on the FDA only because we knew the two specific custodians at the FDA. And the specific date range, and we had very narrow search terms for these two specific FDA custodians, it was pertaining to a study. And they came back to us and they said, it's going to take two years just to process this request, even knowing these two custodians. And then assuming we even approve your request, it will take another year after that just to produce the documents. So that's with knowing the individuals involved. And I would point Your Honor's attention to the Henry Grand Jury Inspector case that kind of set the standard in Illinois State Court for the exhaustion. And what they say is exhaustion depends on the facts and circumstances of the individual case. There, there was only three people that potentially had the information that the petitioner was trying to seek. And the court said, hey, because you didn't go out and actually talk to those three people and try to get the information from them, then you can't have satisfied exhaustion under the facts and circumstances of this case. Here, there are not three people. There could be 3,000, and we don't even know who they are. So under the facts and circumstances of this case, given all the other stuff that was due, and I just want to correct some misrepresentations about the steps that plaintiffs took to get this information before coming to JAMA. So first things first, the study authors themselves produced thousands of documents, and none of those documents revealed who the source of this late critique was. They don't know themselves. The study authors then sat for days of deposition. Bronstein was imposed. William Mitch, another study author, was deposed. David Light, the CEO of Allisher, who was a study author, also deposed. None of them knew. They said, go talk to JAMA. Then we did actually propound discovery on all the drug company defendants. We did that before having to do the divestiture petition, and that yielded no responsive documents as well. Only after doing all of that did we turn to JAMA. So that said, I believe that the exhaustion, as the circuit court put it, the exhaustion doesn't require the plaintiff to have to go on a fishing expedition. It just has to be under the facts and circumstances of the case. Did you go and you try to get the information from all the available sources? And Apelli clearly did that here. So, Mr. James, I want to just make sure I understand the relevance. Sure. And I was having a somewhat difficult time articulating it, but I think what you're telling me is that the pharmaceutical company defendants in the California litigation are going to rely on, among other things, the Gao study, which was published in JAMA, and Professor Gao or Dr. Gao is an FDA employee, and he was critical of the Braunstein study from Memorial Sloan Kettering, correct? That's correct. And so you want to understand the communications that took place between JAMA and this government official to understand why the study was pulled, the Braunstein study was pulled from publication, and you suspect that it was because the FDA had a problem with it. And take me from there. I mean, you said something about credibility. Sure. So you're going to use these communications to attack the credibility of the Gao study? Is that what you're saying? Somewhat. I think the question is more, it's less the content of the communications, it's more the fact that a particular agency was doing that. If we found out that it was the FDA that was intervening to pull the study, regardless of why it was done. Why is that relevant, though? You know, if you're saying that, let's assume it was the FDA, the FDA stepped out of its lane, why is that relevant to your underlying litigation where the issue is causation and knowledge? Well, with respect to causation, it's extremely relevant because, as you were saying, given that the FDA has put out these studies that speak to causation, if they are then intervening and they are pulling articles that would fall on the other side of the ledger with respect to causation, and if the defendants themselves are, you know, pointing at the FDA as kind of a beacon of impartiality and saying, look, these great studies that the FDA is putting out. So you're saying that it would allow you to attack the defendants' reliance on the FDA studies that support their position? That is correct. That's exactly correct. And just to... And just shorthand, shorthand, it undermines the FDA's credibility. Exactly. Because that's important to you. Exactly. And is there any other aspect or any other point you want to make with respect to the relevance? With respect, I think... Or is there any other reason why it's relevant? Those are the principal reasons in terms of... Because I think the law is pretty clear that the relevance has to be with respect to proving a specific element of a cause of action. It is circumscribed in that regard, at least with respect to the reporter's privilege. With this common law privilege they're claiming, on the other hand, with this balancing test, it's a little more nebulous. And I want to speak for a little bit about that while I still have time in terms of the common law privilege they're claiming. As you all have pointed out, there really isn't any Illinois authority that speaks directly to this issue. The Sukiye case, that didn't concern a common law peer review privilege. They weren't claiming that there. They were claiming reporter's privilege in the Medical Studies Act. The remaining cases that they cite, they're all distinguishable. Each and every single one of those cases actually involve kind of your paradigm case of the journalist soliciting peer reviewers. They're soliciting independent referees. They're sending these studies to these scientists to be reviewed. None of them contain a factual scenario like this. And it's clear that all of them, even if you were inclined to find this a peer review situation, all of them do employ this balancing test. It's not an absolute privilege. And one of the cases actually kind of draws an interesting... They have their own... That's right. In one of the cases, I think it was the Massachusetts State Court case. I forget exactly which one it was, but one of the cases explicitly said we're declining to create a new privilege here. This is not our job here to create this new privilege. We're just simply going to do a normal kind of evidentiary balancing, you know, the relevance against the burden essentially. But I want to just briefly direct your attention to one of the cases they cite and rely on, which is the INRI pelvic mesh products liability litigation. And that case actually draws an interesting distinction in terms of the scope and the contours of whatever this common law kind of nebulous peer review privilege is. And so there they did do the balancing and they claimed, okay, sure, the identities of the peer reviewers themselves and the peer review comments, those are confidential. We're not going to disclose those. But there was some evidence in that case that the product manufacturer, Ethicon, actually somewhat behind the scenes was collaborating on this study, was involved in the study design and potentially writing some of this study. The court there found that there was a matter of public interest there, that those communications between the manufacturer and the journal, that would not be covered by any sort of common law peer review privilege. I think we're kind of in an analogous situation where there is this third party that is intervening to, you know, to shape the scope of the science here, which would not be covered by this common law peer review process privilege. I want to come back for a second because I want to come back to the relevancy. So the relevancy really is whether there was some pharmaceutical company that may have prevented this publication. Is that why this information is relevant? I mean, more ancillary, down the line, that is absolutely another area in which this could be relevant. Because embargoed copies of this study, after it had already been peer reviewed and approved for publication, and with the publication date, were sent around to the media. We know for a fact that Sanofi, who was the brand holder at the time, got a copy of this embargoed copy, and it expressed a criticism, this is in the record, expressed a critique of the study that is kind of eerily close to what this, you know, source that we don't know said when they intervened. So it's quite possible that... Well, let's say that that's the case, and let's say that you learned that that information is what's going on here. How does that then get to your issue, which is to show that there was this prior knowledge of this cancer-causing agent, and that they knew it? To be clear, I don't necessarily think it speaks to the prior knowledge, like the failure to the warn question. I think it speaks to causation. That is what I think it speaks to. I just want to be clear on that point. Thank you. And so I guess, so I've talked about the common law peer review process privilege. I've talked about why I don't think that applies. We've talked about relevance, which is relevant for the balancing in this common law privilege. It's also an element of divestiture. I've talked about exhaustion. So lastly, I suppose I will talk about the public interest prong of divestiture, right? Let me just say really quickly, Mr. Barrett's argument is that your only interest is to win your lawsuit. There is no public interest. That's right. Just if you want to start there. Sure. And I put this in the brief, but I think it's ironic that JAMA does have an article. It was written by a Dr. Kesselheim, where they discussed that oftentimes it is private civil litigants that are forced to be drug safety researchers of last resort. The discovery process in cases like this can oftentimes expose the very regulatory oversights and also the failures, the negligence in clinical trials that lead directly to real public safety harms in society. So obviously if a government agency is intervening to pressure this journal to pull a study, that obviously speaks to public health and public safety. I mean, there's really no question about that. And I think appellee's status as a private civil litigant doesn't diminish from that fact. So briefly to conclude, I've argued here that the common law peer review process privilege, to the extent it's even a privilege recognized by the state, I don't think it is. It doesn't apply because the person that intervened here is not a peer reviewer. There's no question about that. We have the comments of the actual peer reviewers. They were disclosed by the study authors themselves. The critique of, you know, who this person was when they intervened, that was not conveyed to the study authors like in a normal peer review situation. So that privilege doesn't apply. Even if it did, even if this was a peer review situation, I think the balancing shakes out in appellee's favor. Specifically, I'll briefly note regarding burden, there is a robust protective order, confidentiality order in place with a de-designation process that if this were to be disclosed, no one could just run and post this on the Internet. There would be buy-in. There would be the drug company defendants could contribute to that. JAMA would contribute to that. There is that in place in terms of burden there. So when you're doing the balancing, I think it's clear that given the diminished burden there, and also just briefly with respect to their interest in confidentiality and the kind of chilling effect argument on the peer review process as a whole, I would just like to note that given that I strongly believe that this isn't a peer review situation, the actual peer reviewers themselves were very clear that given the urgent public policy matters and public safety implicated in this article that it should be published immediately. That's what the review said. Given that peer reviewers said that and then the journal ended up pulling it at the behest of who knows, that directly flouted the peer review process. I'm curious, how did you obtain the comments of those two peer reviewers? They were produced by Dr. Braunstein. There's one of the cases that observes that the authors themselves are free to disclose the comments and the identities of the peer reviewers because it's really, you know, they're not supposed to, you know, frequently they're not given that information when their article is being reviewed. Did I understand you correctly that if we were to affirm the trial court's ruling that you have no objection to this court ordering that the subject documents be subject to the protective order that's in place such that documents cannot be disseminated except to the parties and their experts? That's right. We have no problem with that. I mean, that's what we would like. That's abiding by the sheer confines of that protective order. Yeah, just briefly on that gesture, I explained why I think this is relevant. I've explained under the Henry Grand Jury case why we have exhausted all other available means of obtaining this information, and I've explained the important public policy interest that is implicated here. So in conclusion, I respectfully ask that the court deny Gemma's appeal in its entirety. One more question. Oh, sure. The issues in the underlying case you said are primarily causation, but are you also saying it's knowledge? I said it wasn't knowledge. It was not knowledge. I said it was not knowledge. I said it goes to causation, which I think the bias, I think the credibility and bias of the FDA bears on the causation inquiry in the way that they were implicated in shaping the science. So I think it's all funneled through causation. Anything else? Thank you, counsel. Thank you. Yes. Thank you, and I appreciate you giving me a little extra time for my initial remarks and still giving me the five minutes. This is a complicated case. You guys have been living with it a lot longer than us. And let me say, if the court has any questions when you start thinking about it, please feel free to get them. We'll pick up the phone. That was a joke. It was. You can issue an order. Right. Let me begin by saying Mr. James is entirely incorrect when he says the government agency, quote, pressured Gemma to pull the study. They didn't put any pressure at all. What happened was, was that the source wrote a letter pointing out flaws, serious methodological flaws in the article. That's not pressure. That's telling the publisher of Gemma that there's something really wrong with the article that it's meant to publish. That's a quintessential aspect of peer review, as pointed out in the declaration of Flanagan. Second, I would say it's important to know that Judge Johnson did not conduct an evidentiary hearing at all. And she did not make factual findings based on the presentation in an evidentiary hearing. In fact, her initial rulings, I think, were made even before she got the privilege law. But she did do an in-camera inspection. She did do it. But I think she actually made some findings even before she did the inspection. But there was no evidentiary hearing in the case. In terms of the exhaustion prong of the statutory privilege, they say, well, in this other matter, we tried to make a FOIA request and we got the runaround. But here, they didn't even make any effort. They didn't make a single effort to ask the FDA what they strongly suspect to be the source of the information, where they could have said, tell us if you had any interaction with JAMA about an article entitled such and such that was supposed to be published on January 10, 2020. I'm quite confident. I've done FOIA requests. I'm quite confident they were referred back from the FDA. But wouldn't we be in the same place? Wouldn't JAMA have been objecting to the disclosure of these communications on the basis of the privilege? Absolutely. Now, first of all, JAMA wouldn't even have known about it. Because the FOIA request, they wouldn't have told us about it. But second, we have promised that we would accord confidentiality to any peer review statement. If the government is a peer reviewer and if, pursuant to the Freedom of Information Act, it gives information, that does not undercut our promise to honor confidentiality of peer review. And we don't want to have one rule for the government and one rule. So governmental peer review is not protected, but peer review by private persons is protected. We can't have that. I have a question. It surprised me when I looked at the statute that there's no specific provision for this in the statute. But what are your interests? What are you trying to protect here? I'm really glad you asked. We are trying to protect journalism, medical journalism, that depends on honest, strong peer review comments by people who know what they're talking about. And if the people who are either asked to give peer review information or who take it upon themselves to give peer review information know that what they say and who they are are going to be made public, it is very likely that they're going to pull their punches or not even agree to participate. I can tell you from my own personal experience, when I was a young lawyer, I was asked to review a legal assistant. And I wrote a harsh criticism. And the legal assistant fought out about it. After that, I never said anything bad about anyone because I didn't want to get in trouble. And that's human nature. So you're really saying we're trying to protect our sources as any good journalist? Well, we're trying to protect our sources, yes. But one of the reasons we're trying to protect our sources, apart from the fact that it's the right thing to do, is that if we don't protect the sources, medical journalism will be the worst. And the quality of the material that is put out in these journals will be the less. Does Mr. Effient speak to this question of outsiders? I'll call them outsiders. By that I mean persons who have not been engaged by JAMA to peer review. She doesn't speak to it, I think, in those exact words. But she points out that the peer review process includes information that is gotten even after the IRB. I understand that. I understand that it could be continuing, that there could be developments. I understand that. But my question is, can an outsider, such as Government Official A, have any reasonable expectation that his or her communications to JAMA are going to be subject to a privilege when she's never been engaged by JAMA to peer review the article? And the answer is yes. If you're, let's say, a professor at a medical school, and you see an article that's been published, and you think it's really wrong, let's say you're up for tenure, and you see an article that you think is wrong, and you write a letter to JAMA, and you say the article is wrong because it does this wrong and that wrong and the other thing, and then the author finds out that you wrote that, there is a great risk that that person is going to object to your getting tenure or to your promotion. They all know, and JAMA makes it very clear to everyone, that anything you tell them about an article either that's being considered for publication, that's being scheduled for publication but has not been published, or that has been published, that will be held in the strictness of confidence because it wants to encourage people to come forward with thoughtful comments about the substance and methodology of an article. And if that weren't the case, again, we're all human beings, we know that if we know stuff that we say is going to be made public, we're going to be a lot more circumspect about what we're saying. I know that from my own experience. I suspect that each of you knows that from your own experience. So, anyway, as I was saying, they didn't even make a FOIA request, and it's quite possible that it would have been granted much sooner, but the fact that they didn't even make it, I don't see how they can say that they have tried to exhaust all other sources of information. Two more quick comments. You talked about the district court cases, and Mr. James made the point, well, those were federal cases. I think the court said, well, the state has itself not recognized the thing. Well, as I said, first of all, this court has recognized the underlying need for confidentiality in the Souquier case. All of these cases, basically, it's not an absolute privilege. It says you have to balance the need of the movement for the information against the harm to the peer review process that will be caused. So we're not saying that this is like the attorney-client privilege or the doctor-patient privilege, which is absolute. We are not saying that. What we are saying is that the courts recognize that you have to balance the need for the information against the harm to the confidentiality interest in peer review. And it would be a real shame if a case is filed in federal court, one rule applies, but if it's filed in state court, another rule applies. I think it happens. It happens, but it's not a good thing. I agree that it happens, but it's not something that should be encouraged. And we're not saying that there's an absolute privilege that, you know, since it's peer review, they can't get it. What we're saying is you have to balance, and I think the court understands this, you have to balance their asserted need for this information against the harm that is done to the peer review process by disclosing all this confidential information. And here, the more I listen to Mr. James, the more I listen to your questions, it's pretty clear they don't have a need for this information. The question in their underlying case is did rinitidine cause cancer and did the manufacturers know about that at the time they were selling the Zantac with rinitidine. What this peer reviewer may have said in 2020 and what this article may have said is not that important to their case. Maybe it has some marginal importance, but certainly not enough to outweigh the confidentiality of the peer review process. It would be a real blow. I just want this court to know it would be a real blow to medical journalism and to the interests of peer reviewers and the public if you were to divest the AMA of a statutory privilege or if you were to say that their peculiar interest in winning their case outweighs the strong interest and confidentiality of the peer review process. Thank you very much. Thank you. Thank you all for an excellent argument. We will take this matter under advisement, and you will hear from us in due course.